**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBRA S.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 21 C 4853** |
| **v.** | ) | |
| | ) | **Magistrate Judge Beth W. Jantz** |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,**[2] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Debra S.'s application for Disability Insurance Benefits ("DIB"). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). For the reasons that follow, Plaintiff's motion for summary judgment [dkt. 12, Pl.'s Mot.] is granted, and the Commissioner's cross-motion for summary judgment [dkt. 15, Def.'s Mot.] is denied. The Commissioner's decision is reversed, and this matter is remanded for further proceedings consistent with this Memorandum Opinion and Order.

---

[1] In accordance with Internal Operating Procedure 22, Privacy in Social Security Opinions, the Court refers to Plaintiff by her first name and the first initial of her last name.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi has been substituted for her predecessor.

## BACKGROUND

### I.     Procedural History

On October 7, 2019, Plaintiff filed a claim for DIB, alleging disability since August 29, 2011, due to torn meniscus in her knees, advanced arthritis, minimal cartilage in both knees, anxiety, thyroid problems, and high cholesterol.  [Dkt. 9-1, R. 228-238.]  Plaintiff's claim was denied initially and again upon reconsideration.  [R. 69-76, 78-89.]  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 1, 2021.  [R. 35-68.] Plaintiff appeared by telephone due to the COVID-19 pandemic, testified at the hearing, and was represented by counsel, Elizabeth Blackwell.  [R. 37-61.]  Vocational expert ("VE") Gary Wilhelm also testified.  [R. 61-68.]  On February 24, 2021, the ALJ denied Plaintiff's claim for benefits, finding her not disabled under the Social Security Act.  [R. 10-34.]  The Social Security Administration Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  [R. 1-6.]

### II.    The ALJ's Decision

The ALJ analyzed Plaintiff's claim in accordance with the Social Security Administration's five-step sequential evaluation process.  [R. 14-15.]  The ALJ first found that the Plaintiff's date last insured was March 31, 2017. [R. 15.] At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 29, 2011.  [R. 15.]  At step two, the ALJ concluded that Plaintiff had the following severe impairments: hyperthyroidism, meniscal tears of the knees, left shoulder rotator cuff tear, and obesity.  [R. 15-17.]  The ALJ concluded at step three that her impairments, alone or in combination, do not meet or medically equal one of the Social Security Administration's listings of impairments (a "Listing").  [R. 17-

18.]  Before step four, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> [S]he could have operated foot controls bilaterally occasionally; reached overhead with the left upper extremity and reached in all other directions with the left upper extremity frequently. The claimant could have climbed ramps and stairs, ladders ropes or scaffolds no more than occasionally, balanced and stooped no more than frequently, and kneeled, crouched and crawled no more than occasionally. The claimant could have had no exposure to unprotected heights, moving mechanical parts and operating a motor vehicle as part of the job. She could have no exposure to extremes of cold and never in vibration.

[R. 18-27.]  At step four, the ALJ concluded that Plaintiff would not be able to perform her past relevant work.  [R. 27.]  At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could perform jobs existing in significant numbers in the national economy, leading to a finding that she is not disabled under the Social Security Act.  [R. 27-28.]

## DISCUSSION

### I.    Judicial Review

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine disability within the meaning of the Social Security Act, the ALJ conducts a five-step inquiry, asking whether: (1) the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the RFC to perform her past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 416.920(a).

"A finding of disability requires an affirmative answer at either step three or step five." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Id.*

Because the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner and is reviewable by this Court. 42 U.S.C. § 405(g); *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation omitted). "To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." *Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014). While this review is deferential, "it is not intended to be a rubber-stamp" on the ALJ's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). The Court will reverse the ALJ's finding "if it is not supported by substantial evidence or if it is the result of an error of law." *Id.* at 327.

The ALJ has a basic obligation both to develop a full and fair record and to "build an accurate and logical bridge between the evidence and the result [so as] to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837; *see also Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). Although the ALJ is not required to mention every piece of evidence in the record, the ALJ's analysis "must provide some glimpse

into the reasoning behind [his] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *accord Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The ALJ "must explain [the ALJ's] analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) (quoting *Briscoe*, 425 F.3d at 351). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## II. Analysis

Plaintiff argues that the ALJ (1) erred in evaluating the medical opinion evidence of both her treating physician and the agency's medical consultant at the reconsideration level; (2) erred in the evaluation of Plaintiff's residual functional capacity, in numerous ways; and (3) erred in finding Plaintiff's alleged symptoms and limitations were inconsistent with her treatment history.[3] [Dkt. 12, Pl.'s Mem. at 3-16; dkt. 19, Pl.'s Reply at 2-14.] After reviewing the record and the briefs submitted by the parties, this Court agrees that the ALJ did not sufficiently explain his RFC determination, and specifically, did not satisfactorily explain why the objective medical evidence relating to Plaintiff's severe osteoarthritis in both knees did not support the limitations that she reported, including her need to at least occasionally ice and elevate her legs. Because this failure alone warrants remand, the Court does not reach Plaintiff's additional arguments.

The overarching issue connecting most of Plaintiff's arguments is that the ALJ failed to consider or discuss Plaintiff's severe bilateral osteoarthritis of the knees as a separate impairment from her bilateral meniscus tear injury. The medical record from Plaintiff's orthopedic provider

---

[3] Plaintiff's opening brief also challenges the constitutionality of the appointment of former Social Security Commissioner Andrew Saul, Dkt. 12 at 15, but Plaintiff has withdrawn that argument in her reply brief, Dkt. 19 at 14, fn. 2.

demonstrates that Plaintiff treated with an orthopedic surgeon in August 2011, following a fall in which Plaintiff twisted her knees. [R. 719-20.] After X-rays demonstrated abnormalities, and an MRI showed meniscal tears and mild osteoarthritic changes, Plaintiff decided to proceed with bilateral arthroscopies. [R. 721-30.] Plaintiff was advised that she "does have some arthritic wear and that this could continue to give her some problems in regards to symptoms." [R. 725.] Plaintiff understood and wished to proceed with the surgeries, which occurred in October 2011. [R. 725-30.]

Two days after surgery, Plaintiff was seen for a follow-up appointment where she reported doing well with "minimal complaints of any discomfort" and mild edema was noted throughout the knees during her exam. [R. 730.] Plaintiff began physical therapy at that time, and after 19 sessions, she reported 100% improvement in her right knee, with all pain having resolved, and 50% improvement in her left knee, with pain rated at 5/10, increasing with weight-bearing activities such as walking, bending, and climbing stairs. [R. 732.] On December 5, 2011, Plaintiff was cleared to return to work "with restrictions." [R. 737.] Plaintiff then continued with physical therapy, and by December 27, 2011, Plaintiff reported 75% improvement with the left knee, with pain decreased to 3/10 with weight-bearing activity. [R. 740.] Just a few days later, on December 30, 2011, Plaintiff returned to her orthopedics' office for a Synvisc-one injection after she continued to have issues with her knees, including instability with stairs, intermittent swelling and tightness, and an ache in her knees at the end of the day. [R. 742.]

In April 2012, Plaintiff returned to her orthopedics' office and reported that the injection had "helped fairly well for a few months" and that she wanted to proceed with this conservative treatment. [R. 743.] Plaintiff was given a bilateral knee cortisone injection and was "educated on icing and elevating the knees" following the procedure. [R. 743.] Four months later, in August

2012, Plaintiff returned to the orthopedics' reporting joint pain, joint swelling, and trouble walking, and was given another Synvisc injection. [R. 744.] Following the procedure, Plaintiff was educated on icing the knees and was wrapped with an ACE wrap to decrease swelling. [R. 745.]  Three months after that, in November 2012, Plaintiff returned, again complaining of joint pain and joint swelling, but denying trouble walking. [R. 746.] She was given a cortisone injection bilaterally, was educated on icing the knees, and the knees were wrapped with ACE bandages to decrease swelling. [R. 746-47.]

Plaintiff continued to receive knee injections throughout the relevant period.  In April 2013, Plaintiff presented to primary care doctor Dr. Protaziuk with dull bilateral knee pain that she rated at 3-7 out of 10 and had been ongoing for months. [R. 516.] The next month, she followed up with her orthopedic provider still complaining of joint pain and stiffness and received a cortisone injection. [R. 748.]  In July 2013, she received a Synvisc injection after reporting that she continued to have pain in the knee with walking and weightbearing activity and complained of joint pain, joint swelling, muscle weakness, stiffness, and trouble walking. [R. 751.]  In March 2014, Plaintiff reported that the Synvisc injections gave her "a lot of relief," but she had begun having sharp and dull pain in the knees, rated 6 on a 10-point scale, aggravated by walking; in addition to the joint pain, she reported joint swelling, stiffness, and trouble walking. [R. 754.] The following month, she returned to the orthopedics' office and an exam revealed patellofemoral crepitus in both knees. [R. 757.] She received a gel injection and was instructed to ice and elevate the knees. [R. 757.] Nearly a year later, in March 2015, Plaintiff returned for another gel injection, reporting joint pain but not joint swelling. [R. 759.] Plaintiff returned in January 2016 for an injection, complaining of joint pain, stiffness, trouble walking, and reporting that her pain was alleviated with ice and aggravated with walking. [R. 761.] Mild soft tissue swelling was observed, and her treater noted

7

that Plaintiff was "aware definitive treatment is TKR[4] however she would like to avoid surgery at this time." [R. 761.] Plaintiff returned for a gel injection in December 2016, complaining of joint pain and trouble walking; while the gel injection had given her good relief, they had stopped helping, and she rated her pain 7 out of 10, aggravated by stair climbing, sitting and getting up from chairs. [R. 766.]

Plaintiff's date last insured was March 31, 2017. In 2020, after experiencing two more falls in 2017 and 2019, Plaintiff finally underwent the total knee replacements that her orthopedic physician had been telling her she would need throughout the relevant period. [R. 769, 781, 806, 810, 858.] At the hearing before the ALJ, Plaintiff testified that, prior to 2017, she experienced swelling in her knees and her feet, with her knees sometimes swelling up to the size of a softball. [R. 60.] She testified that the swelling increased if she was more active during the day and that she would ice and elevate her legs every chance she got. [R. 60-61.] The vocational expert testified that, if a person needed to elevate their legs to waist level while seated, they would not be able to perform light or sedentary jobs because employers would believe that their employees were unable to maintain pace and productivity in the course of the workday. [R. 67.] The vocational expert further testified that these jobs would tolerate no more than one and a half days of absence per month on average, and no more than 15% of the workday off task. [R. 67.]

Plaintiff argues, and this Court agrees, that given this evidence, and particularly the vocational expert's testimony, the ALJ was required to discuss, as part of the RFC, whether Plaintiff needed to elevate her legs and determine how long or how frequently she needed to elevate her legs. [Dkt. 12 at 7.] According to SSR 96-8p, the RFC assessment is required to include a narrative discussion that describes how the evidence supports each conclusion that the ALJ makes.

---

[4] Presumably, "total knee replacement."

Specifically, the RFC assessment must "contain a thorough discussion and analysis of the objective medical and other evidence, as well as a resolution of any inconsistencies in the evidence and a logical explanation of the effects of the symptoms on the Plaintiff's ability to work." The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p.

Here, the ALJ's decision noted Plaintiff's testimony about swelling in her knees and feet, (though the ALJ mistakenly recounted that Plaintiff had said her knees swelled to the size of soccer balls, when in fact Plaintiff estimated the swelling to be softball-sized). [R. 20, compared to R. 60.] The ALJ also noted Plaintiff's report that she iced and elevated her legs "every chance she had." [R. 20.] The ALJ nonetheless provided no analysis for why these reported limitations were not accepted as consistent with the medical evidence. Rather, the ALJ simply included boilerplate language that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," and went on to summarize most, but not all, of the relevant medical evidence recounted above. [R. 20.] The ALJ noted several of Plaintiff's injections for knee pain and Plaintiff's diagnosis of osteoarthritis (at first deemed "moderate" and later "severe") at multiple points in his summary. [R. 22, 25.] But the ALJ frequently left out the notations in the orthopedic records of Plaintiff's ongoing complaints of joint swelling, stiffness, or difficulty walking, while at the same time *including* those instances when Plaintiff's primary care provider, Dr. Protaziuk, noted no swelling or no edema. [R. 20-25.]

After the summary, the ALJ concluded that:

the longitudinal records prior to the date last insured reflect that the claimant had conservative treatment for her hyperthyroidism, meniscal tears of the knees, left

> shoulder rotator cuff tear and obesity with noted improvement with treatment. Her review of systems and examinations were unremarkable with the claimant in no acute distress, having normal gait and no noted edema. (Ex. 5F; 8F). At the hearing and in the records she reported improvement after her knee injections (Ex. 8F). She testified at the hearing that physical therapy helped and the physical therapy records show that her right knee issues resolved and she had improvement in her left knee (Ex. 8F). Furthermore, the records indicate that claimant was consistently encouraged to engage in regular exercise. The records also reflect that she engaged in activities greater than her alleged limitations such as doing electrical work for a friend and staying at home with two young children (Ex. 4F). Nonetheless, given the claimant's longitudinal treatment for complaints, the degree of abnormality on clinical physical examination, level of outpatient and inpatient care, and conservative treatment, I find that the claimant would have been limited to light work.

[R. 25.] The ALJ then stated that he was accommodating Plaintiff's reports of knee pain, as well as her other symptom reports, by restricting her to only occasional operation of foot controls; occasional climbing of ramps, stairs, ladder ropes, or scaffolds; occasional kneeling, crouching and crawling, and no more than frequent balancing and stooping. [R. 25-26.]

"While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), *as amended* (Dec. 13, 2000). "Most importantly, he must build an accurate and logical bridge from the evidence to his conclusion." *Id.* (*citing Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) and *Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir. 1998)). This "logical bridge" must be such that the Court can "trace the path" of the ALJ's reasoning from the evidence presented to the conclusion reached by the ALJ. *See Thelmarae W. v. Saul*, 476 F. Supp. 3d 717, 724 (N.D. Ill. 2020). If the logical bridge has not been built, this Court must remand the case, *even if* the Court agrees with the ultimate result. *See id.* (*citing Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) for the proposition that "... we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision,

the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result").

Here, the ALJ did not even list Plaintiff's bilateral knee osteoarthritis among Plaintiff's medically determinable impairments, either at Step Two or in the RFC determination. [R. 15-17, 25-27.]  Rather, the ALJ frames Plaintiff's knee pain as relating to meniscal tears—a discrete injury rather than an ongoing, degenerative condition—concluding that her right knee issues had "resolved" and noting that she had improvement in her left knee. [R. 25.] The reference to the right knee issue "resolving" appears to be derived from the post-operative physical therapy note from December 2011 (after the October 2011 bilateral arthroscopies) stating that she experienced 100% improvement in the right knee and 75% improvement in the left. [R. 740.]  But the subsequent orthopedic notes demonstrate that this improvement was hardly permanent, and in fact, Plaintiff's orthopedic provider noted her osteoarthritis as progressing from "mild" in August 2011 [R. 722] to "moderate" in August 2012 [R. 744-45] and "severe" by December 2012 [R. 746]. As described above, Plaintiff returned to her orthopedics' office repeatedly between December 2012 and her total knee replacements in 2020 for gel and cortisone injections to manage ongoing knee issues caused by her osteoarthritis, including, at various times, joint pain, joint swelling, and difficulty walking. And after each of these injections, Plaintiff was instructed to ice and rest or elevate her knees and had them wrapped with an ACE bandage to manage swelling.

The ALJ failed to explain why he was not crediting Plaintiff's reports of swelling and pain that required icing and elevation, especially when the medical record did corroborate that she was instructed to do this for at least some period following each of her knee injections. It may be, as the Commissioner suggests [Dkt. 16 at 22 n.6], that this icing and elevation was infrequent or minimal and would not have precluded full-time employment at the light exertion level. But the

ALJ did not probe this issue with Plaintiff at the hearing and certainly did not draw the logical bridge necessary to support such a conclusion based on the evidence in the record. *See Jarnutowski,* 48 F.4th at 773 (ALJ has duty to develop the record); *see also Kerijean H. v. Kijakazi*, No. 3:22-CV-0106-RLY-MJD, 2023 WL 4072619, at *4 (S.D. Ind. June 20, 2023), *report and recommendation adopted,* No. 322CV00106RLYMJD, 2023 WL 4472568 (S.D. Ind. July 11, 2023) (where ALJ did not ask claimant how long she had experienced tremors or whether they had progressed in severity or frequency, the fact that tremors were not noted in 2020 treatment records was not evidence that contradicted her testimony about tremors occurring in 2021). Likewise, while the medical records do note that Plaintiff reported "good relief" from the knee injections, it is not clear that this was sufficient to allow Plaintiff to return to full-time light work. *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), *as amended* (Aug. 20, 2014) ("The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled."). Plaintiff's "good relief" may well have been contingent on her ability to follow her doctor's advice to rest and ice the knees as needed—something that may have precluded her from full-time, light work employment. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("[N]o employer is likely to hire a person who must stop working and lie down two or three times a day for an hour at a time.")

Indeed, the record evidence shows that Plaintiff never returned to full-time employment, despite testifying that she was totally unaware at the time that she might be eligible for disability benefits. [R. 50.] The ALJ appeared to credit the fact that Plaintiff was "encouraged to engage in regular exercise" and "engaged in activities greater than her alleged limitations such as doing electrical work for a friend and staying home with two young children" as evidence that Plaintiff's testimony about her limitations was not credible. [R. 25.] But a person's ability to perform daily

activities "does not necessarily translate into an ability to work full-time," *Roddy*, 705 F.3d at 639. Here, the ALJ asked Plaintiff at the hearing whether she still did chores like laundry, mopping, and dishes between 2011 and 2017, and she answered that her husband helped "a lot," including by taking the laundry downstairs for her and washing it, while she did the sorting and folding. [R. 59.] She further testified that she was limited in her ability to participate in her children's activities such as soccer—walking to the field was "very painful," she could not practice with them, and she would sit off to the side while her husband did "all the physical things." [R. 59-60.] There is no other testimony in the record to support the idea that the fact that Plaintiff was home with her young children during this time demonstrates that she could have been out working a full-time, light work job.

All of this matters because the vocational expert testified that needing to elevate one's legs would preclude a person from working light or sedentary jobs because employers would believe that their employees were unable to maintain pace and productivity in the course of the workday, as would being off task more than 15% of the work day or needing to take more than one and a half days off work in a month. [R. 67.] Given this testimony, even if Plaintiff's need to elevate and ice her legs was occasional and not constant, it still might preclude full-time work. But we cannot be sure either way because the ALJ failed to reconcile or even probe into this, and provided no analysis for why he was discrediting Plaintiff's need to ice and elevate her legs due to osteoarthritis in her knees.

In short, the Court concludes that the ALJ failed to build the accurate and logical bridge from the evidence to his conclusion. The ALJ's RFC determination is inadequate because it fails to address Plaintiff's testimony that she needed to ice and elevate her knees—testimony that was corroborated by the medical record and not necessarily inconsistent with the record evidence

showing that she experienced improvement with physical therapy and pain injections or her testimony about her daily activities. On remand, if the ALJ believes there is insufficient information regarding the frequency and duration of Plaintiff's need to ice and elevate her legs during this period, appropriate questions should be asked at the hearing to further develop the record, and then connect the evidence to the RFC analysis accordingly.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt. 12] is granted, and the Commissioner's motion for summary judgment [dkt. 15] is denied. The Commissioner's decision is reversed, and this matter is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**SO ORDERED.**

Date:  9/29/23

_____
BETH W. JANTZ
United States Magistrate Judge